J-S05019-17
J-S05020-17

IN THE INTEREST OF: K.K., A MINOR  :  IN THE SUPERIOR COURT OF
:  PENNSYLVANIA
:
APPEAL OF: K.D., MOTHER  :
:  No. 1445 MDA 2016
:

Appeal from the Order Entered August 15, 2016
In the Court of Common Pleas of Cumberland County
Juvenile Division, at No. CP-21-DP0000075-2010

IN THE ADOPTION OF: K.K.  :  IN THE SUPERIOR COURT OF
:  PENNSYLVANIA
:
APPEAL OF: K.J.D., MOTHER  :
:  No. 1458 MDA 2016
:

Appeal from the Order Entered August 17, 2016
In the Court of Common Pleas of Cumberland County
Orphans' Court Division, at No. 55 Adoptions 2016

BEFORE:  BENDER, P.J.E., PANELLA, J., and PLATT[*], J.

MEMORANDUM BY PANELLA, J.  **FILED FEBRUARY 21, 2017**

In these related appeals,[1] K.D. ("Mother") appeals from the orders of

the Court of Common Pleas of Cumberland County entered on August 15 and

August 17, 2016, respectively, that changed the goal of her daughter, K.K.

_____

[*] Retired Senior Judge assigned to Superior Court.

[1] The appeals are related in that they involve the same individual and consider the same set of facts to determine that Child's goal should be changed to adoption and that her Mother's parental rights should be terminated. Mother filed separate notices of appeal and filed the same brief in each appeal. The trial court filed separate Pa.R.A.P. 1925(a) opinions that differed only in that one bore the caption and number of the Juvenile Division dependency proceeding and the other the caption and number of the Orphans' Court Division adoption proceeding. This Court deemed the cases related in an entry dated September 22, 2016.

("Child"), born in November 2006, to adoption and involuntarily terminated her parental rights to her daughter.[2] We affirm.

CYS became involved with Child in June 2010 upon learning that Mother would leave Child home alone at night, or take Child with her when she went out drinking. The trial court adjudicated Child dependent on October 10, 2010; she remained with Mother under a safety plan. The trial court ordered Mother to complete a drug and alcohol evaluation, follow any recommendations, and comply with random urine screens.

CYS placed Child with her maternal step-grandfather on January 19, 2011, after Mother was incarcerated for driving under the influence. On May 16, 2011, CYS placed Child in informal kinship care when step-grandfather could no longer care for her.

Mother made progress over the next year and a half and, on December 6, 2012, CYS returned Child to her to her care and terminated Child's dependency. In January 2014, however, CYS received reports that Mother was drinking, engaging in domestic violence with her boyfriend, and leaving Child alone for extended periods. CYS provided in-home services until March 23, 2015, when CYS learned that Mother was drinking daily to the point of intoxication, leaving the Child alone, fighting with her boyfriend

---

[2] The trial court also involuntarily terminated the parental rights of Child's Father, D.K. He has not appealed that termination.

in front of Child, and that Child was expressing fear of Mother. Police had been to the home on January 24, and February 26, 2015, for complaints of intoxication and domestic disputes.

At a shelter care hearing on March 26, 2015, the trial court placed Child temporarily in the previous informal kinship home and ordered that Mother's contact with Child be supervised. The trial court adjudicated Child dependent again on April 16, 2015. On May 29, 2015, CYS placed Child with her maternal great-aunt and great-uncle as informal caregivers. On August 3, 2015, great-aunt and great-uncle became formal kinship foster parents. Child remained with them at the time of the termination hearing in this matter.

The family service plan dated June 4, 2015, required Mother to remain drug and alcohol free, supervise Child appropriately, follow the conditions of her probation, cooperate with CYS, and seek mental health care.

In the beginning of March 2016, Mother was again making progress and Child was able to stay with Mother for an extended visit with the possibility of a return to Mother's custody at the next scheduled permanency hearing in April. On March 22, 2016, however, CYS learned from Child that Mother had begun drinking again and had choked Child. This report triggered a Child Protective Services investigation and Child returned to great-aunt and great-uncle.

CYS filed a petition to change Child's goal to adoption on May 19, 2016, and filed a petition to terminate Mother's parental rights on June 6, 2016. The trial court held a hearing on those petitions on August 3, 2016. Testifying at that hearing, in addition to Mother and Father, were Winding Creek Counseling Services counselor, Jamie Orris; CYS caseworker, Shelly Barrick; Maternal Great-Aunt and adoptive foster mother, L.K.; and, on behalf of Mother, Gaudenzia West Shore Outpatient counselor, Kay Foltz Brown.

Ms. Barrick testified that Mother's goals were to remain drug and alcohol free, meet the conditions of her probation, cooperate with CYS, and undergo a mental health evaluation. *See* N.T., 8/3/16, at 30-31.

According to Ms. Barrick, Mother was cooperating with CYS but had not undergone a mental health evaluation. She said that Mother's "primary goal is to remain drug free . . . [but,] during the life of the case from April 2015 to now there have been numerous times where [Mother] has relapsed." *Id*., at 26. Ms. Barrick related Mother's recent history of relapses:

> [Mother] had relapsed back in October of 2015 – September, sorry, of 2015 with cocaine. She then had a positive screen in November of 2015 for alcohol. After that time she had been doing well. We obviously believed that she had been doing well. We returned [Child] to her home on an extended basis around February 2016.
>
> Then in March of 2016 we had received reports that [Mother] had been drinking again. I had been told of three or four times from December of 2015 until March of 2016 that she

had been drinking while [Child] was present and while [Child] was in the home.

[Child] was then again returned to [Great-Aunt] in March of 2016. Mother then had an alcohol monitoring bracelet put on at that time.

*Id*.

At one point, according to Ms. Barrick, "something was placed in between [Mother's] legs and the bracelet for 12 hours, but there was no positive alcohol screening when it was again working, for lack of a better word." *Id*., at 27.

CYS did not start testing Mother for substances other than alcohol until May 2016. Mother had seven negative drug screens from May through June but missed all subsequent screens. *See id*., at 27-29. Mother claimed that she was unable to appear for one drug screen because she was out of town, but Ms. Barrick testified, "We did contact her work the following day, that Friday, and she was working and we did not believe that she was out of town." *Id*., at 28.

Ms. Orris testified that Child's placement with great-aunt and great-uncle is beneficial for Child:

At the moment she's at a good, stable place for the first time in a while. There's nobody physically abusing anybody else, there's no use of substances, there's no screaming or shouting, there's no having to explain someone's behavior to your friends or tiptoe around because you don't know if someone is going to be drinking when you get home.

- 5 -

Her life is now essentially what it's supposed to be for a nine-year old. If she went back to [Mother], there's just a level of upheaval that seems to have been present pretty much her entire life with [Mother] that is exceedingly bad for her in every way imaginable.

*Id*., at 10-11.

When asked if great-aunt and great-uncle were capable of supporting Child emotionally if Mother's parental rights were terminated, she responded:

Yes, actually, I think that as a family, they are fairly well equipped to deal with much of that. But whatever they would not be equipped to deal with [great-aunt] has been very good about making sure [Child] has what she needs  Even if it's something she has to find outside of the family system. She is very in tune to what [Child] needs and very responsive to her in a way that is very supportive to [Child].

*Id*., at 11.

When asked if Child should have continuing contact with Mother, Ms. Orrick opined, "You know that's a difficult question because in general I think that children need to have contact with their parents. But I don't see that contact [with Mother] being anything over time that is going to be positive for [Child]. *Id*., at 11-12.

The trial court entered its order changing Child's goal to adoption on August 15, 2016, and its order terminating Mother's parental rights on August 17, 2016.  Mother filed her notices of appeal and concise statements of errors complained of on appeal from both orders on September 2, 2016.

Mother raises the following questions on appeal:

Did the [t]rial [c]ourt err as a matter of law and abuse its discretion in determining that [CYS] presented evidence so clear, direct, weighty, and convincing as to enable the fact finder to come to a clear conviction without hesitancy, of the truth of the precise facts in issue?

Did the [t]rial [c]ourt err as a matter of law and abuse its discretion in determining the best interests of the children [sic] would be served by changing the permanency goal from reunification to adoption, when the evidence indicated that Mother could provide for the [C]hild's needs and appropriately parent the children [sic]?

Did the [t]rial [c]ourt err as a matter of law and abuse its discretion in determining the best interests of the children [sic] would be served by terminating the parental rights of Mother, when the evidence indicated that the original reasons for placement of the [C]hild no longer exist [sic] or had been substantially eliminated?

Mother's Brief, at 5.

Our standard of review is as follows:

In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings.The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Further, we have stated:

Where the hearing court's findings are supported by competent evidence of record, we must affirm the hearing court even though the record could support an opposite result.

We are bound by the findings of the trial court which have adequate support in the record so long as the findings do not evidence capricious disregard for competent and credible

- 7 -

evidence. The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. Though we are not bound by the trial court's inferences and deductions, we may reject its conclusions only if they involve errors of law or are clearly unreasonable in light of the trial court's sustainable findings.

*In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S.A. § 2511. In order to affirm the termination of parental rights, this Court need only agree with any one subsection of § 2511(a). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Section 2511 provides, in pertinent part:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be

- 8 -

> beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

A party seeking termination of a parent's rights bears the burden of proving the grounds to so do by "clear and convincing evidence," a standard which requires evidence that is "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re T.F.*, 847 A.2d 738, 742 (Pa. Super. 2004) (citations omitted). Further,

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In the Interest of K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (internal citations omitted).

The Adoption Act provides that a trial court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). The Act does not make specific reference to an evaluation of the bond between parent and child, but case law requires the evaluation of any such bond. *See*, *e.g.*, *In re E.M.*, 620 A.2d 481, 484 (Pa. 1993). However, this Court has held that the trial court is

- 9 -

not required by statute or precedent to order a formal bonding evaluation performed by an expert. *See In re K.K.R.-S*., 958 A.2d 529, 533 (Pa. Super. 2008).

We state our standard of review of a trial court's determination to change a child's goal as:

> When we review a trial court's order to change the placement goal for a dependent child to adoption, our standard is abuse of discretion. In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was manifestly unreasonable, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record.

*In re: N.C.*, 909 A.2d 818, 823-24 (Pa. Super. 2006).

Before we begin our analysis, we must address the shortcomings of Mother's brief. In the argument section of her brief, Mother cites a number of cases that apply generally to the termination of parental rights, but she fails to demonstrate how those cases, applied to the specific facts of this case, support her claim that the trial court erred or abused its discretion when it terminated her parental rights. Mother then examines the evidence presented and asks us to reach a different conclusion than that reached by the trial court. This we may not do. *See In re M.G.*, *supra*.

Mother makes no effort whatsoever to link the facts of her case to the law. In sum, she makes no attempt to develop a coherent legal argument to support her conclusion that the trial court erred in terminating her parental rights and she has, therefore, waived that argument. "The failure to develop

an adequate argument in an appellate brief may result in waiver of the claim under Pa.R.A.P. 2119." ***Commonwealth v. Beshore***, 916 A.2d 1128, 1140 (Pa. Super. 2007) (citation omitted).

Even though we could find that Mother waived her issues on appeal by her patent failure to develop a coherent argument, we will briefly analyze her claims in the light of the record. Taken as a whole, in her questions presented Mother claims that CYS did not present sufficient evidence to support the trial court's decision to terminate her parental rights.[3] We disagree.

CYS presented sufficient credible to permit the trial court to terminate Mother's parental rights pursuant to subsection (a)(2). Mother's family service plan goals were to remain drug and alcohol free, cooperate with CYS and secure a mental health examination. Ms. Barrick's testimony demonstrated that Mother relapsed into the use of drugs and alcohol from the time she first had contact with CYS in 2010 to the time of the termination hearing. Mother cooperated with CYS to some extent, but never underwent a mental health evaluation. At the time of the termination hearing Mother had not appeared for several drug screens and provided CYS with reasons for not taking them that CYS found reason to doubt. Mother

---

[3] Mother's questions presented do not directly challenge subsections (a) and (b), but she implicates them in her language.

- 11 -

has demonstrated an incapacity, neglect or refusal to parent Child that she cannot or will not remedy.

Ms. Orris's testimony on the issue of Child's best interests and welfare is compelling. She opined that living with Mother was, "exceedingly bad for [Child] in *every way imaginable*." N.T., at 11 (emphasis added). She concluded, "I don't see that contact [with Mother] being anything over time that is going to be positive for [Child]." *Id*., at 12.

Ms. Orris's testimony regarding Child's adoptive foster parents, on the other hand demonstrates that they are concerned with Child's best interests and welfare, "[Great-Aunt] has been very good about making sure [Child] has what she needs. Even if it's something she has to find outside of the family system. She is very in tune to what [Child] needs and very responsive to her in a way that is very supportive to [Child]." *Id*., at 11. The termination of Mother's parental rights will serve Child's best interests and welfare.

In addition to her questions presented, Mother also complains in her brief that the trial court erred by not finding that CYS had failed to make reasonable efforts to reunite her with Child and that it erred when it failed to order a formal assessment of the bond between herself and Child. *See* Mother's Brief, at 15-16.

Mother cites this Court's decision in *In the Int. of D.C.D.*, 91 A.3d 173 (Pa. Super. 2014), to support her claim that an agency like CYS must

make reasonable efforts to reunite a child with his or her parents. When she made this claim, however, Mother was apparently unaware that our Supreme Court reversed this Court in that case when it held:

> [T]he Pennsylvania Legislature has not incorporated reasonable efforts into the language of 23 Pa.C.C.A. §2511(a)(2) and it would be improper and, indeed, unwise, for this Court to add such language by judicial fiat.

**In re D.C.D.**, 105 A.3d 662, 672-673 (Pa. 2014).

In addition, Mother was apparently also unaware that a trial court is not required to order a formal bonding assessment. **See In re K.K.R.-S**, **supra**.

We also find no abuse of discretion in the trial court changing the placement goal to adoption.

Accordingly, for the reasons stated, we find that the trial court's decisions to change Child's goal to adoption and to terminate Mother's parental rights pursuant to § 2511(a)(2) and (b) are supported by clear and convincing evidence in the record, and that there was no abuse of the trial court's discretion.

Orders affirmed.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/21/2017

- 13 -